GULF, C. & S. F. RY. CO. v. GREEN.

(Court of Civil Appeals of Texas. Austin. Nov. 1, 1911. On Motion for Rehearing, Nov. 29, 1911.)

1. CARRIERS (§ 363*)—EJECTION OF PASSENGER —PLACE.

While a carrier is not bound ordinarily to awake a sleeping passenger that he may disembark at his station, and, after he is carried by without fault of the carrier, he becomes a trespasser subject to ejection, the carrier is nevertheless bound not to put him off at an unsafe place, which might jeopardize his health or likely injure his life.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1445, 1446; Dec. Dig. § 363.*]

2. CARRIERS (§ 351*)—EJECTION OF PASSENGER—STATUTES.

Paschal's Dig. art. 4892, prohibiting the ejection of passengers between stations, having been omitted from the revision of the statutes, and not having been re-enacted, is no longer the law of the state.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 351.*]

3. CARRIERS (§ 383*)—PASSENGERS—EJECTION —PROPER PLACE—QUESTION FOR JURY.

In an action for wrongful ejection of a passenger, evidence held to require submission to the jury of the question whether the place of ejection was proper.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1492–1496; Dec. Dig. § 383.*]

4. CARRIERS (§ 369*)—EJECTION OF PASSENGER—INJURIES—PROXIMATE CAUSE.

Plaintiff, a lad 13 or 14 years old, who had never been in the state before, was carried by his station while asleep some time after 2 o'clock in the morning, and then ejected in the country, where there was no house near by, some 2½ miles past the station, and just after the train had passed over a long bridge and trestle. He testified that the conductor told him that the station was about a mile back, and that, when he struck the trestle, it was so dark that he was required to cross by "cooning it"; that, when he got part way across, he saw another train coming onto the trestle by which he was greatly frightened, though he escaped unhurt, reaching the opposite side of the bridge before the train passed, but this frightened him to such an extent and caused such a nervous shock that he was thereafter unable to sleep or rest at night because of nightmares and dreams, which resulted in serious mental injury. Held, that the carrier's breach of duty in ejecting plaintiff at an improper place was the proximate cause of such injury.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 369.*]

5. TRIAL (§ 253*)—INSTRUCTIONS.

In an action for injuries to a passenger caused by his alleged wrongful ejection at an improper place, a request to charge that if the carrier made the usual announcement of the station in a manner loud enough to be heard by passengers, and the train stopped a reasonable

length of time at the passenger's destination, but he failed to alight because of his being asleep, and was carried by the station, then he became a trespasser, and the carrier was entitled to eject him, and it was the jury's duty to find for defendant, was properly refused as omitting the carrier's alleged negligence in ejecting plaintiff at an improper place, and as failing to submit the question of negligence to the jury.

[Ed. Note.—For other cases, see Trial, Dec. Dig. § 253.*]

6. TRIAL (§ 252*) — INSTRUCTIONS—APPLICABILITY TO EVIDENCE

Where a passenger after being carried by his station was ejected at an alleged improper place, and there was no evidence of any demand and refusal to pay fare to the next station, a request to charge that if plaintiff was expelled on account of his failure to pay fare to the next station, provided the conductor had no reason to believe that putting him off at the particular place would result in injury, plaintiff could not recover, was properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 596–612; Dec. Dig. § 252.*]

7. CARRIERS (§ 13*)—FREE PASS LAW—APPLICATION.

Acts 30th. Leg. c. 42, prohibiting carriers from transporting passengers gratis, does not prevent railroad companies on carrying a passenger past his station at night by mistake from carrying him free to the next station.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 13.*]

8. APPEAL AND ERROR (§ 1060*)—REVIEW—PREJUDICE.

Where the preponderance of the evidence was not against the verdict which was not excessive, and there was no reason to believe that the verdict was affected by comment of plaintiff's attorney to the jury on defendant's exceptions, and an alleged improper statement of the law, such acts were not reversible error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4135; Dec. Dig. § 1060.*]

On Rehearing.

9. NEGLIGENCE (§ 61*)—"PROXIMATE CAUSE."

To constitute a negligent act the proximate cause of an injury, it is not necessary that it be the sole cause, but it is sufficient if it is a concurring cause from which the result might reasonably have been contemplated as involving the result which actually happened under the circumstances, it not being necessary that the injury in the precise form in which it in fact resulted should have been foreseen; it being sufficient that it appears after the accident to have been a natural and probable consequence (quoting 6 Words & Phrases, p. 5760).

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 74, 75; Dec. Dig. § 61.*]

10. CARRIERS (§ 363*)—INJURIES TO PASSENGERS—EJECTION—IMPROPER PLACE.

Where the conductor of a passenger train ejected a lad traveling alone at night after he had been carried 2½ miles beyond his destination, owing to his being asleep when the train stopped at his station, the conductor was charged with knowledge of the nature of the roadbed and trestles the boy would be required to recross to go back to his destination, and with the knowledge of the schedule of trains which he would probably meet in the course of his journey, which should be considered in determining whether the conductor was negligent in ejecting him at that point, and whether ejection there would probably result in injury or harm to him.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1445, 1446; Dec. Dig. § 363.*]

Appeal from District Court, Milam County; J. C. Scott, Judge.

Action by Sanford Green, by W. J. Green, his next friend, against the Gulf, Colorado & Santa Fé Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Terry, Cavin & Mills and A. H. Culwell, for appellant.

RICE, J. This suit was instituted to recover damages for the alleged wrongful ejectment of appellee Sanford Green from the cars by appellant's conductor, it being charged that he was carried by his station in the nighttime and ejected at a lonely place, and as a result thereof sustained serious and permanent injuries. Appellant answered by general and special exceptions, and, further, that the station of Cameron, which was the destination of the boy Sanford Green, was announced in the car in which he was riding just before the train reached that station, at which time the boy was asleep and failed to alight, owing to the fact that he was asleep; that he was ejected at a convenient place; and that the employés of the company, in so ejecting him, had no notice that he would suffer injury thereby. There was a jury trial, resulting in a verdict and judgment for plaintiff, from which appellant prosecutes this appeal.

It appears from the evidence that on the 13th of October, 1909, plaintiff's father purchased a ticket at Featherstone, Okl., for plaintiff, who was then a boy 13 or 14 years of age, for Cameron, Tex., and thereafter placed him on board of the cars for his destination. The train upon which he was riding arrived at Cameron some time after 2 o'clock on the morning of the 14th of October, at which time the boy was asleep, and did not hear the announcement of the name of the station which it is claimed was made by appellant's employé, and for which reason, it is presumed, he was carried beyond said station. After passing the station some 2½ miles, the conductor aroused and compelled the boy to alight from the train, telling him before he left the train that he had reached his station, and that the depot was only a short way back, but, after he had alighted from the car, he stated to him that it was some mile or such distance up the track, and immediately started the train, leaving the boy on the ground. The boy was not awakened at Cameron by the conductor or porter, and it appears that his hat check, indicating his destination, had not been taken up by the conductor. There was no demand on the part of the conductor that he should pay his fare to the next station, nor was anything said about it at the time he was ejected; but the boy testified that he would have been willing to pay his

fare, if he had known that he was not at a station when he was put off. He was ejected in Little River bottom, about 2½ miles from Cameron. The night was very dark, and it is not shown that he was near any house. The boy was a stranger, never having been in the state. The evidence shows that this bottom was spanned by a long trestle and bridge, and that the boy undertook at once, as directed by the conductor, to go to the depot, encountering this trestle or bridge, which he undertook to cross by "cooning" it, and while so doing a rapidly approaching train from the south ran onto the trestle, whereby the boy was greatly frightened, though he escaped unhurt, reaching the opposite side of the bridge before the train passed. It is abundantly shown by the testimony that from this fright he experienced a great nervous shock, by reason of which his mind was affected, and he was unable to sleep or rest at night on account of nightmares and dreams, from which, when aroused, he would scream that the train was running over him. This condition was shown to have continued for a long while, and physicians testified that they were unable to say how long he might remain in this condition.

The chief contention on the part of appellant is that the court erred in refusing to grant a new trial on the ground that the evidence failed to sustain the judgment.

[1] The only issue submitted for the consideration of the jury by the charge of the court was whether or not the appellant was guilty of negligence in compelling the boy to disembark from the train at the time and place under the circumstances indicated, telling the jury that he, after leaving Cameron, had ceased to be a passenger, and if they believed that the company was guilty of negligence in causing him to disembark, and that the same was the direct and proximate cause of his leaving the car and being injured, then to find for the plaintiff. It is the contention of appellant that it was not its duty to awaken appellee, but was only required to announce the station before reaching Cameron, and to stop a sufficient length of time to allow passengers to disembark from the train, all of which it did, whereby appellee, on account of his failure to leave the train at Cameron, became a trespasser, and it had the unrestricted right to compel him to leave the train at any point after passing Cameron without being liable therefor. Counsel for appellant has cited us to cases announcing the doctrine that it is not the duty of a railway company under such circumstances to awaken a sleeping passenger, and that it is not required, without payment of additional fare, to carry the passenger to the next station, and also to cases which establish the doctrine that the company under such circumstances would not ordinarily be liable in damages for the expulsion of a passenger between stations. But,

while this we concede to be the true rule, yet it is not without limitation or exception. We think that, notwithstanding the right thus to expel a traveler who has been carried beyond his destination on account of his own fault, still the railroad company rests under the duty of not putting him off at an unsafe, insecure, or dangerous place, which might jeopardize the health or likely injure the life of the passenger. In several of the states statutes have been enacted forbidding railway companies from ejecting passengers between stations, but requiring them to proceed to the usual and customary stopping point before doing so. See note to Burch v. Baltimore & Potomac R. R., 26 L. R. A. 129, for a collation of such statutes and decisions thereunder.

[2] There was formerly such a statute in Texas (Paschal's Dig. art. 4892), but this provision was omitted in the revision of the statutes and has not been re-enacted, and is therefore no longer a law in this state. See, also, T. & P. Ry. Co. v. Casey, 52 Tex. 112. And, in states where there is such a statute, recoveries have been allowed where passengers were put off between stations, irrespective of the manner of their ejectment, or the character of the place at which they were expelled; but, in the absence of such statutory provision, it seems that the company is only liable in the event that such expulsion is accompanied by unnecessary force or violence, or the ejectment was made at an improper place, such as would jeopardize the life or health of the passenger, and injury was proximately caused therefrom. See note to Burch v. B. & P. Ry. Co., supra; the question of liability being one of fact for the jury, under all the circumstances of the case. T. & P. R. R. Co. v. McDonald, 2 Willson Civ. Cas Ct. App. § 164; I. & G. N. R. R. Co. v. Gilbert, 64 Tex. 536; International & G. N. R Co. v. Smith (Sup.) 1 S. W. 565 (Oct. 19 1886); Malone v. Pittsburg & L. F R. R, 152 Pa. 393, 25 Atl. 638; Hall v. S. C R. F Co., 28 S. C. 261, 5 S. E. 623; Ill. Cent. R R. v. Latimer, 28 Ill. App. 552. In Burch v. Baltimore & Potomac R. R., supra, it was said, in discussing the right of the company to eject a person wrongfully upon its train: "It may not eject him with undue violence. It may not eject him at an unsafe or dangerous place, upon a trestlework, for example. or in a marsh or in a desert, or upon a bank of snow. Then again, when such trespasser is a person more or less incapable of taking care of himself—a child, a lunatic, an imbecile, a person under the influence of intoxicating liquor—consideration of humanity will demand that they receive different treatment from that awarded to the ordinary adult man, in full possession of all of his faculties, as was the plaintiff in this case." See Louisville, C. & L. R. Co. v. Sullivan, 81 Ky. 624, 50 Am. Rep. 186. In Moore on Carriers, § 11, p. 749, where this question is

discussed, it is said: "In the absence of a statute providing at what places the carrier may lawfully eject persons from its cars or trains, the passenger who has forfeited his right to travel may be ejected at any point where he will not be subjected to or reasonably liable to peril; but he may not be ejected at any place on the road where he is likely to be injured, such as in a pond of water, on a high trestle or in a dangerous swamp or other place of danger. Where a passenger is carried beyond his station through no fault of his own, he may not be arbitrarily and violently put off where there is no dwelling and remote from any station; and, if he is put off under such circumstances, he may recover substantial damages. The question as to whether the place where the passenger was ejected was a proper place or an improper one in such cases has been usually held to be one of fact for the jury, under the circumstances of each case" —citing numerous authorities in support of the text. See, likewise, 6 Cyc. 563, where it is said: "The servants of the carrier should not expel a passenger (or even a trespasser) at a time or place which is dangerous; and the carrier will be liable in such case, not only for injuries directly suffered in connection with such expulsion, but also for subsequent injuries proximately due thereto, such as injury from other trains, which the ejected person could not reasonably avoid, the probable consequences of improper exposure, and the like. And it will be no answer that the person was injured by reason of his helplessness due to intoxication, or like cause, if his condition was known to the servant of the carrier, and the consequent injury resulting from the expulsion could have been reasonably anticipated."

[3] So that it seems the question is one of fact for the determination of the jury under a proper charge as to whether, under all the circumstances, the expulsion in the present case was rightful or not. This question has been resolved by the jury in favor of the appellee and against the appellant, and we think the evidence abundantly justifies such finding, for which reason the several assignments presenting this question are overruled.

[4] The third assignment insists that a new trial should have been granted, for the reason that appellant was not responsible for the injuries which occurred to the boy after leaving the train and on his way to Cameron. The rule seems to be well settled that the company would be responsible for all injuries proximately resulting from their wrongful act in ejecting a passenger under such circumstances which could have been reasonably anticipated, and, if in attempting to reach his station the boy encountered dangers from a passing train, it seems to us that the company would be liable therefor, provided the jury should believe that such dangers could have reasonably been antici-

pated to ensue from the wrongful conduct. 6 Cyc. 563; I. & G. N. R. R. v. Terry, 62 Tex. 380, 50 Am. Rep. 529.

[5] Three special charges asked by appellant, made the basis of the fourth, fifth, and seventh assignments of error, were refused, each of which was predicated upon the theory that if the company made the usual announcement of the station in a manner loud enough to be heard by the passengers, and that they stopped a reasonable length of time at Cameron for passengers to alight, and that plaintiff failed to alight therefrom on account of being asleep and was carried beyond the station, then he became a trespasser, and the company had the right to eject him, and it was the duty of the jury to find, under such circumstances, in favor of the defendant. These charges were properly refused, because they required a finding in favor of the defendant, irrespective of whether it was guilty of negligence in ejecting the plaintiff at an improper place, and because the same failed to submit the question of negligence vel non to the jury.

[6] There was no error in refusing special charge No. 4, which directed a finding in favor of the defendant if the jury believed that the plaintiff was expelled on account of his failure to pay his fare to the next station, provided the conductor had no reason to believe that putting him off at the particular place would result in injury. In the first place, there was no evidence that raised any issue whatever relative to the payment of fare; and, besides this, the conductor, upon the nonpayment of fare, is not authorized to expel a trespasser at an improper place, and he would have the right to recover if he had been put off at such improper place, notwithstanding the conductor had no reason to believe that the place at which he was ejected was an improper place, if in fact it was such.

[7] Nor do we think that the court erred in refusing special charge No. 6, which instructed the jury, in effect, that it would have been unlawful under the circumstances for the company, in the absence of payment of fare on the part of plaintiff, to carry him to the next station, as it is contended that to do so would contravene the anti-free pass law (Acts of the 30th Leg. c. 42, p. 93), citing in support of its contention Trinity & B. V. R. R. Co. v. Carpenter, 132 S. W. 837. We do not believe this act was intended to prevent railway companies under such circumstances as shown by this record from carrying a passenger free to the next station. To have refused, it seems to us, would have been contrary at least to the spirit of said act. In the case last cited, which was an action brought against the company for rudely threatening to expel plaintiff's wife from the cars, unless she paid fare for her child, which was over five years of age, but who, it seems had taken the child aboard

under the belief that it had the right to ride free, it was held that it was improper to refuse a charge, in effect telling the jury that the conductor had the right to state to plaintiff's wife that it was unlawful for him to carry the child without the payment of fare, provided that in so doing no rude or insulting language was used towards her. Certainly that case is not authority for the contention made here. The spirit of the statute would not have been violated by carrying the boy free to the next station, even if its letter could be held to uphold the conduct on the part of the conductor, which we very much doubt. In Waldstein v. State, 29 Tex. App. 82, 14 S. W. 394, where a saloon keeper was prosecuted for unlawfully selling liquor to a minor, it was held that the spirit of the law was not violated where it was shown that the minor falsely represented to the defendant that his father had sent him in a hurry to get whisky for his sick mother; the court holding that whenever a thing done is not within the mischief evidently intended by the statute, though within its words, the deed is not punishable, citing in illustration a technical violation of the ancient law which provided that whoever drew blood in the street should be punished. This statute was construed as not being applicable to a surgeon who opened the veins of a person who fell down in the street in a fit.

[8] The thirteenth and fourteenth assignments complain of the argument of counsel on behalf of appellee, who was allowed to read to the jury certain of appellant's exceptions, and to comment thereon in connection with the testimony of the conductor, as well as certain other testimony in the case. These exceptions were couched in a humorous vein, and seemingly were intended to make light of plaintiff's case. The conductor had testified that he did not remember having ejected plaintiff from the train. Counsel for appellee in commenting on the testimony of the conductor said that he did not blame him for failing to remember that he had put the boy off the car, and then took up and read said special exceptions, and, commenting thereon, said: "That is the way the company feels about this thing. It is immaterial that you take a young farmer boy, and carry him out here, and wreck his mind and memory, and destroy his usefulness for life, it is a matter that the attorney for the corporation makes sport of and light of, to laugh it out of court." Counsel, continuing, said: "A railroad owes a care to its passengers, and it owes to its passengers the highest degree of care, but it does not owe to every passenger the same degree of care. It is not true that you owe to me the same degree of care that you owe to a little child. The child fell off to sleep. They knew he was on the train. They took his ticket up. They knew he was a child.

His physical appearance showed that. They knew he was alone, because they got his ticket from him, and they were charged with the duty to bring that boy safely to Cameron, and to afford him an opportunity to alight safely from that train, and that very duty itself which the law imposed upon them includes with it, under the circumstances in this case, the duty to wake him up at that station, and give him an opportunity to alight. It would not do it to me or you. It would not be included in the railroad's duty to me or to you." These last remarks were objected to on the ground that they were not a correct statement of the obligation of the defendant to the plaintiff, and that the company owed him no such duty as contended for in said argument. While we are not prepared to say that it was proper practice for counsel to read appellant's exceptions to the jury, and while we do not hold that his statement of the law as applied to the duty of the defendant was correct, still we have been cited to no case where it has been held that the mere reading to the jury of the exceptions of the adverse party and commenting thereon was reversible error. Nor do we think that simply because counsel in their zeal may have made a misstatement of the law of the case should be held ground for reversal. No complaint is made here that the verdict is excessive, nor does it seem that the language used was calculated to arouse the prejudices of the jury against the defendant. It is held in I. & G. N. R. R. Co. v. Irvin, 64 Tex. 535, that the use of improper language in course of argument by adverse counsel, within itself furnished no sufficient reason for reversing a judgment, and it is only in cases in which the preponderance of the evidence seems to be against the verdict, and in cases in which the verdict seems to be excessive, and there is reason to believe that the verdict may have been affected by such course of conduct, that it becomes a ground for reversal, for which reasons we overrule these assignments.

The remaining assignments have been duly considered, and are regarded without merit.

Finding no error in the proceedings of the trial court, its judgment is affirmed.

Affirmed.

On Motion for Rehearing.

Appellant has filed its motion for rehearing, as well as an elaborate argument in support thereof, stressing chiefly the contention that we erred in overruling its third, ninth, and tenth assignments, wherein the verdict was questioned on the ground that the principal damage complained of could not have been properly considered as the proximate result of the act of its employés in ejecting the boy from the train. We deem it advisable in this connection to amplify, to some extent, our statement as to what happened at the time of the expulsion, as

well as the resultant effects thereof upon the health and mental status of the boy.

The boy testified that he was aroused from his sleep and told by the conductor that he had arrived at his station. Upon his asking the conductor where the station was, the latter replied it was back down the track. The conductor did not tell him that he had been taken by his station, nor did he offer to take him to the next station, nor ask him to pay fare to that point. The boy testified: "He merely told me that this was my station, and put me off. He told me which way to go to the station. He said, 'Go back down the track,' and I went the way he told me. The night was dark. I had never been to this place before, and had never been in Texas before. I did not see any house around where I was put off. After I found out that I was not at my station, the train had gone. I could not see Cameron at all. The only way that I knew which direction to go was the conductor's directions. He said before leaving it was a mile and a half to the station from where he put me off. I knew where the railroad bridge is across Little River. It was beyond that bridge. They had just got across the bridge good. If I had known that I was so far from the station when I was put off, I would have paid my fare to the next station. When the train left me there on the track alone, I could not see about me. It was so dark I could hardly see my hand before me. I undertook to go back to town as the conductor directed me. I just got on the track and went on. When I got to the bridge, I could feel that I was on a board or something. I had to feel my way across the bridge 'cooning' it, as I was afraid I might fall off. I heard and could see the train coming. It was going north." The boy stated that he was very much frightened, and that by dint of effort he reached the opposite side before the train passed. He was almost transfixed to the spot by fear and unable to proceed for some 30 minutes, and the testimony of those who saw him the next day show that he appeared to be dazed, half crazy, as it were; that prior to that time he was a boy of average and ordinary intelligence, able to work intelligently. Since then, however, the evidence shows he has scarcely any memory, unable to understand or intelligently work at any task. A number of physicians who testified stated that their examination disclosed that his mental status was far below that of a boy of his age; that he had a soreness about the spine and spinal column, which indicated a nervous trouble, and that the conditions described by the other witnesses as to his appearance and mental condition might have been brought about by the fright that he had undergone, which conditions existed since the time of the trial, and, in their opinion, might probably be permanent.

[9] In this case the negligence alleged and proven upon which the plaintiff relied for recovery was expelling the boy from the train at an improper place. The authorities in the original opinion amply support the view that, notwithstanding the fact that the carrier may have the right between stations to eject a passenger who has for any cause been carried by his station, still this right is a limited one, and can only be exercised by ejecting the passenger at a proper place, one where he is not likely to receive injury or harm in his efforts to reach his destination. So in the present case, if the boy was ejected from the train at an improper place, then the only question remaining for consideration is whether or not such expulsion was the proximate cause of his injury. If it was, then appellant should be held liable, otherwise not.

It is said in 13 Cyc. p. 27, that: "The question as to what damages will be considered the natural and proximate consequences of the injury, and what damages will be considered remote, is one difficult of decision. It may be stated as a general rule, however, that where the result of an unlawful act is a natural one, and one that would naturally flow from the act done, it is not remote, but proximate. If, upon the contrary, the damages complained of would not naturally or usually flow from the negligent act, but were brought about by some unforeseen casualty, then they would be remote. Within the rule which limits a recovery for injury to those damages which are its natural and proximate effects, the natural effects are those which might reasonably be foreseen, those which occur in the ordinary state of things, and proximate effects are those between which and the injury there intervenes no culpable and efficient agency. The matter is usually one of evidence, which should be left to the decision of the jury. The general rule in actions for torts is that one is liable for all injuries resulting directly from his wrongful acts, whether they could or could not have been foreseen by him, provided the particular damages in respect to which he proceeds are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as according to common experience and the usual course of events might reasonably have been anticipated. Remote, contingent, or speculative damages will not be considered in conformity to the general rule above laid down. To render a wrongdoer liable in damages where the connection is not immediate between the injurious act and the consequence, such nearness in the order of events and closeness in the relation of cause and effect must subsist, as that the influence of the injurious act will predominate over that of other causes to produce the consequences, or be traceable to those causes." "To constitute a negligent act the proximate cause of the injury, it need not be the sole cause, but it is sufficient

if it is the concurring cause from which such a result might reasonably have been contemplated, as involving the result under the attending circumstances." 6 Words & Phrases, p. 5760; S. A. & A. P. Ry. Co. v. Jazo, 25 S. W. 712. In discussing this subject, Mr. Hutchinson on Carriers (vol. 3, § 1429) says: "Where, therefore, the carrier has wrongfully set the passenger down short of his destination, or carried him beyond it, and has thereby imposed upon him the necessity of getting to his destination by other means, the carrier must respond, whether the action be brought for breach of contract or for the tort, if the passenger while in the exercise of reasonable care and prudence for his safety has received an injury while seeking to extricate himself from the situation in which the carrier has thus wrongfully placed him, as where a man with his wife and child, passengers to M., were told by a brakeman that they had reached that place, and to get out, when, in fact, they were three miles distant. They were set down in the nighttime at a place where they could find no shelter, and therefore walked to their destination, exposed to the weather, which had been rainy, thereby causing serious illness to the wife, the carrier was held liable. So where the carrier neglected to stop at the passenger's destination, and carried her five miles beyond, and put her off, saying that she would there find a conveyance back, which was not furnished, and she therefore walked for three hours on a hot, sultry afternoon, crossing streams, climbing fences, and pursued and frightened by dogs, all of which brought on a siege of illness, the carrier was held liable. So the carrier has been held liable to the passenger for sickness caused by willful delay, by unjustifiable detention and exposure to an unhealthy climate, for injury to health caused by exposure to the weather after having been wrongfully expelled from the train, for bodily suffering caused by being compelled to walk back to his destination after being negligently carried beyond it, for sickness and suffering caused by failure to stop at a regular and advertised landing place, and thereby leaving passengers exposed all night to the weather, and for an injury sustained in getting back to the station after having been wrongfully ejected."

See, also, I. & G. N. R. R. Co. v. Gilbert, 64 Tex. 536, where it was held that the plaintiff was entitled to recover for bodily and mental injuries resulting from her efforts to reach a place of comfort and safety, she having been ejected from the cars, where Justice Willie says in passing upon a demurrer to the petition: "Of course, it is not urged by the defendant that these were not the direct, natural, and proximate results of the misconduct of the conductor. But, if it were, the position would be so contrary to reason and authority as to require no argument to overthrow it. But it is said that the damages resulting to defendant from having walked back to Longview from the place where she was ejected from the cars were too remote to be allowed. As to whether or not she was justified in going back to Longview depends upon the circumstances by which she was surrounded when left by the train. As already stated, the plaintiff was unaccompanied by any male protector. She had with her a sister and two infant children. She was in the swamp of a river in a strange land. It was a cold, dark night, and she could get no shelter, except with negroes; and, whilst she and her companions might have been as safe with them as anywhere else, it was certainly justifiable in her to seek security at the nearest point, where, within her knowledge, it could be afforded. The condition and surroundings of the place where she was forced from the cars were well known to the employés of the road. The influence that they would have upon a person in the plaintiff's condition must also have been known to them; and they might reasonably have contemplated that she would take such precautions as in her judgment would contribute to her safety and comfort. This is precisely what she did; and, if she committed an error, it was an innocent one, and those who forced her into the condition in which she was placed by their own wrongful acts have no right to complain"—citing H. & T. C. Ry. Co. v. Devainey, 63 Tex. 174. In T. & P. Ry. Co. v. Mansell, 23 S. W. 549, it was held, Mr. Justice Rainey delivering the opinion, that, where a passenger was carried half a mile past his station on a dark and damp night, he could recover for the exposure, fatigue, and mental distress caused by his walk back to the station. It appears that one of the injuries complained of in the last case cited was fright from a passing railway train. In Atchison, Topeka & Santa Fé Ry. Co. v. Parry, 67 Kan. 515, 73 Pac. 105, it was held, as shown by the syllabus, that negligence, to be the proximate cause of an injury, must be such as a person of ordinary caution and prudence must have foreseen would likely result in injury, not that the specific injury would result. The question whether negligence is the proximate cause of an injury is ordinarily one of fact for the jury. In that case a judgment for damages was sustained where the plaintiff, having been removed from the car by the conductor and left in charge of a station agent, was by the latter permitted after a short time, and before his recovery, to go where he pleased; the cause of the removal being that he had had a fit upon the car. Some time afterwards he was found four or five miles from the station dead, having been run over by a train. In passing upon the question as to whether the company was responsible, the court said: "'The duty of the railroad company, however, with respect to Weber did not end with his removal from the train.

He was unconscious and unable to care for himself. The company could not leave him upon the platform helpless, exposed, and without care or attention. It was its duty to exercise reasonable care and diligence to make temporary provision for his protection and comfort. As was said by the learned judge who tried the cause: "Of course, the carrier is not required to keep hospitals or nurses for sick or insane passengers; but, when a passenger is found by the carrier to be in such a helpless condition, it is the duty of the carrier to exercise the reasonable and necessary offices of humanity toward him until some suitable provision may be made."'" The court also remarking in passing: "It is further contended that, even though the depot master was negligent in his manner of treatment of the deceased, such negligence was not the proximate cause of the death; that no reasonably prudent man would have foreseen that Parry would have wandered away for a distance of five miles, and have laid down or fallen upon the track in such a place and position that he would be run over by the train and thus killed; and that the company, therefore, was not required to guard against so improbable a result. Negligence, to be the proximate cause of an injury, must be such that a person of ordinary caution and prudence would have foreseen that an injury would likely result therefrom; not that the specific injury would result, but an injury of some character. '"It is not necessary," say the Supreme Court of Minnesota, following the Supreme Judicial Court of Massachusetts, "that the injury, in the precise form in which it in fact resulted, should have been foreseen. It is enough that it now appears to have been a natural and probable consequence." In other words, it is not necessary to a defendant's liability, after his negligence has been established, to show, in addition thereto, that the consequence of his negligence could have been foreseen by him. It is sufficient that the injuries are the natural, though not the necessary and inevitable, result of the negligent fault.' Thompson's Com. Law of Neg. § 59. It here appears that the place where the depot master permitted Parry to go by himself was a street crossing, over which tracks were laid, along which trains passed. It was a place of danger to one not in the possession of his faculties—a place where the depot master might reasonably have apprehended that harm of some sort would come to Parry in his then condition; so that, although he wandered for hours and was run over five miles from this place, the act of the depot master in permitting him to go was no less the proximate cause of his death than it would have been if it had occurred within a short distance and a few moments."

See, also, Johnson v. Louisville & Nashville R. R. Co., 104 Ala. 241, 16 South. 75, 53 Am. St. Rep. 39, where a drunken passenger who was ejected was afterwards run over and killed by another train. It was said by the court in discussing the question under consideration: "There is another principle of law to be observed, which requires of all persons, in the exercise of a right or the performance of duty, that it be done with reasonable regard to the preservation of life and prevention of great bodily harm or the infliction of unnecessary injury to others, and they will be held responsible for the manner in which the right is exercised or duty performed. It is an exceptional case where the law does not subordinate personal rights to the preservation of life. A conductor has the right, under proper circumstances, to eject a passenger from a car; but he would not be justified in exercising this right while the car was at a high rate of speed, or when upon a high trestle, nor would he be justified in putting off a person who was blind or deaf, knowing his infirmity, except at a safe place. Upon like principles, the law would not justify a conductor in putting off a passenger at a time and place, and under conditions and circumstances, which would expose him unnecessarily to great peril of life or bodily harm; and this, too, whether the danger arose from the natural infirmity of the person or was self-imposed. If the conductor did not know of the infirmity of the person and the peril attending the ejection, there would be no liability arising from the exercise of the right and performance of the duty. It is the fact of notice or knowledge of the danger on the part of the conductor under such circumstances that constitutes the act culpable or willfully wrong." See, also, 15 Dec. Ed. Cent. Dig. § 59, under the subject of "Negligence," supported by many authorities, where it is said: "To give a right of action on the ground of defendant's negligence, the injury must have been the natural and probable consequence of such negligence, and such as, under the circumstances of the case, might and ought to have been foreseen." See, also, M., K. & T. Ry. Co. v. Hennessy, 20 Tex. Civ. App. 316, 49 S. W. 917, T. & P. Ry. Co. v. Gott, 20 Tex. Civ. App. 335, 50 S. W. 193, T. & P. Ry. Co. v. Casey, 52 Tex. 112, and 6 Cyc. p. 566, on the question of the right of a passenger to recover for personal injuries resulting from efforts to reach some place of security after expulsion.

It would seem, therefore, to be the settled law of this state that if the plaintiff in this case was ejected at an improper place, and in his effort to reach his station he was injured and hurt, if such injuries ought to have been anticipated as the natural and probable result of such expulsion, the carrier would be liable therefor.

[10] Ought the conductor to have foreseen that an inexperienced boy, who had been directed by him to leave the train under the belief that he had reached his station, would

not likely suffer some injury in endeavoring to reach his destination by walking up the track and across the trestle, in the dark, as he had directed him to do? Was the conductor not charged with a knowledge of the schedule of appellant's trains, and with such familiarity with its roadbed and trestles as to have anticipated danger to the boy in his effort to cross the same? Could it not be fairly said that he should have anticipated that this boy whom he had put off in the dark would likely follow his directions in an effort to reach the station, and that in doing so he would undertake to cross this river bridge and trestle, and that while so doing the north-bound train would probably overtake him while on the bridge, thereby causing him injury and harm? Was not the wrongful act of putting the boy off in the night, under the circumstances, the proximate cause of the terrible fright occasioned by the swiftly approaching train, from which he narrowly escaped death by dint of his presence of mind and energy, but which left him almost transfixed to the spot with fright, and the results of which are shown to have been so damaging to him. Can appellant shield itself from responsibility by urging that the boy, a stranger, should have remained in the woods till morning before attempting to reach his station and the friends who were there expecting him? Was it not the most natural thing for him to endeavor to reach Cameron, and in so doing follow up the right of way, as directed by the conductor, and ought not the conductor to have reasonably anticipated that accident or damage might befall him under the circumstances? We think so. We have carefully considered each of the cases cited by appellant in support of its contention that appellee's injuries in this case are not shown to have been the proximate result of his expulsion. We think the facts in each of them distinguish them from the case at bar, and the law announced in neither of them should control the present appeal.

Believing that appellee's injuries were the proximate result of the negligence of appellant in ejecting him from the cars, and that the correct result has been reached by us in the original opinion, its motion for rehearing is therefore overruled.

Motion overruled.